WARREN J. McCLAIN, PETITIONER-RESPONDENT, v. BOARD OF EDUCATION, CITY OF WOODBURY, NEW JERSEY, RESPONDENT-APPELLANT.

Argued September 14, 1959—Decided September 28, 1959.

SCHETTINO, J. A. D. Appeal is from a judgment of the County Court in favor of the petitioner awarding him compensation for a heart attack. The Deputy Director, Division of Workmen's Compensation had similarly found in favor of petitioner.

In his petition, petitioner stated that in the course of delivering an address to a P. T. A. sponsored dinner meeting, heat, exertion and emotion caused a heart attack. The respondent contends that petitioner's disability was not caused by a compensable "accident."

The case was tried before the Deputy Director prior to the decision of the Supreme Court in *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N. J.* 127 (1958). Consequently it was presented to the Deputy on the theory of the "unusual strain or exertion" heart case rule which was understood to be the law prior to *Ciuba.* The Deputy Director found that petitioner had been speaking at the meeting in an atmosphere charged with antagonism; that at the time and place petitioner was "subjected to unusual and abnormal excitement and nervous tension in a very warm room," and that the coronary attack constituted an accident arising out of and in the course of his employment. Thus, even under the strict heart rule then followed, the Deputy Director found that the petitioner was entitled to compensation.

The appeal was heard in the County Court after the Supreme Court had decided *Ciuba.* The county judge agreed with the findings of the Deputy Director as to the circumstances that existed at the time of the speech, and that there had been strain, but he did not agree that the strain was "unusual" because he felt it was strain to which petitioner was accustomed. Nevertheless, he held that as unusual strain was no longer necessary under *Ciuba,* petitioner was entitled to recover.

On this appeal appellant argues that petitioner's heart attack was not an accident arising out of and in the course of petitioner's employment. Petitioner, in addition to countering this argument of appellant, contends that the appeal should be dismissed on the ground that appellant has failed to make the deposit for the costs of the appeal required by *R. R.* 1:2–10, *R. R.* 2:2–5.

■ We first consider petitioner's argument that the appeal should be dismissed on the ground that appellant failed to make the deposit for the costs of appeal. *R. R.* 1:2–10 makes an exception "that no deposit for costs shall be required where an appeal is taken by the State or any political subdivision thereof or an officer or agency of the State or any political subdivision thereof or by direction of any of the Principal Departments of the State * * *." We hold that defendant Board of Education comes within the exception and therefore did not need to make the deposit.

■ We next consider whether petitioner's heart attack was an accident arising out of and in the course of his employment. This is primarily a factual question in which case it is our duty to weigh independently the evidence and determine whether plaintiff has sustained the burden of proof, giving due regard to the Deputy Director's opportunity to judge the credibility of the witnesses. *Yeomans v. Jersey City*, 27 *N. J.* 496 (1958).

■ It is, of course, a fundamental proposition that "an injury suffered during the course of work does not *per se* entitle one to the benefits of the Workmen's Compensation Act * * *." *Henderson v. Celanese Corp.*, 16 *N. J.* 208, 212 (1954). Moreover, the presumption exists "that injury from heart disease is the result of natural physiological causes, and the *onus* remains upon the petitioner to show by a preponderance of the probabilities that his employment was a contributing cause of the injury." *Yeomans, supra* (27 *N. J.* at *page* 509). See also *Ciuba* (27 *N. J.* at *page* 138).

In *Ciuba* Mr. Justice Heher stated (27 *N. J.* at *pages* 134–135):

"An 'accident' in the legislative sense is an 'unlooked for mishap or an untoward event which is not expected or designed'; and such is the case where a heart ravaged by disease succumbs to strain or exertion arising from the doing of the master's work, even though it be a normal incident of the service, in no sense extraordinary, and such as a sound heart could withstand. * * * The essential inquiry is whether the disabling injury or death is causally related

to strain or exertion attendant on the doing of the master's work. Did the accident come from disease alone, or did the employment contribute to it?"

The strain or exertion arising from the doing of the master's work may be emotional and nervous as well as physical. *Aromando v. Rubin Bros. Drug Sales Co.*, 47 *N. J. Super.* 286, 293 (*App. Div.* 1957), certification denied 26 *N. J.* 244 (1958).

The facts of the instant case are now appraised in the light of the above authorities. It is clear that in order to sustain the determination in favor of petitioner it must be concluded that the events of November 15 produced an effect upon petitioner which precipitated the heart attack.

Petitioner had held the position of superintendent of schools of Woodbury for a period of about 13 years prior to the heart attack. Before that date he had been in good health, with no manifestation of cardiac or circulatory illness. During the years 1955 and 1956 petitioner had dealt with the delicate problem of racial integration in the Woodbury schools. Since 1955 there had been considerable agitation and controversy in the community and the press about integration. Some complained about the allegedly slow rate of integration, while others were just as bitter that it was too swift. Petitioner, referring to the early fall of 1956, testified "I felt quite tense over the situation. I had been through a year of intense pressure * * * and I seemed to be in the middle of the entire picture. It was largely my responsibility to try to reach a middle ground, try to * * * satisfy both sides."

The Carpenter Street School presented particularly difficult problems because until September 1956, it had been a segregated school. That segregation had been ended, said petitioner, and the dinner was a dedication "to an extent" of a new unit of the school. Upon arriving at the school hall with his wife, he found the room jammed with about 200 people, many of whom did not belong to the P. T. A., which was sponsoring the dinner.

Petitioner testified that as he spoke at the conclusion of the dinner, he felt what he conceived to be the unfriendly attitude of some of those present. This, he said, was most discomforting and distressing to him. During his speech he began to feel quite warm, perspired freely, noticed that his voice did not appear to be carrying to those in the audience. When in addition he began to feel nauseous, he brought his speech to an abrupt close, omitting much of the end of it, and sat down. While the audience was still applauding, he felt he had to go out for air so he left the people, and, upon reaching the door, collapsed.

He was taken to a hospital where his treating physician diagnosed his illness as "arteriosclerotic heart disease and acute myocardial infarction." This doctor testified that in his opinion there was a causal relationship between the activities of plaintiff on November 15, 1956 and the myocardial infarction which he suffered and that the heart attack occurred "from the intense emotional situation present." Another doctor testified for petitioner to the same effect. He stated in answer to a hypothetical question: "It is my opinion that the myocardial infarction was precipitated by this chain of events."

An architect, testifying for petitioner, stated that there had been a great deal of trouble with the Carpenter Street School heating system. A school teacher stated that the meeting room was very warm; that the heating system was in bad condition even after it had been fixed. The school music director testified that the room was "so warm" that she had remarked "I wonder if they can't give us a little bit of fresh air." She also stated that she knew something was wrong with petitioner because he concluded his remarks without an appropriate ending. There was testimony that when petitioner arose to speak he "was terribly nervous and pale."

Respondent's medical expert testified that in his opinion extreme or severe tension was not a factor which could cause or precipitate a coronary occlusion, and that petitioner's

myocardial infarction was "due to the coronary artery disease, arteriosclerotic changes of the coronary arteries and that he had narrow vessels and in this one area developed a clot and it occluded."

Taking the totality of the testimony (and bearing in mind that the Deputy Director who heard and saw the petitioner's witnesses found them trustworthy) petitioner has persuaded us that he was unusually tense, nervous and strained because of all the circumstances combined.

We next consider the question of causal relation. Petitioner's doctors testified, as we have said, that the events of November 15 precipitated the myocardial infarction. One of them, in answer to a request to explain how the myocardial infarction was precipitated by the chain of events, said:

"Well, number one; this was not the usual situation in which Dr. McClain ordinarily found himself, it would have to be placed in a category of a different or unusual situation as evidenced from the history primarily that being an educator, a person in that status usually can make a speech with very little preparation. He spent a lot of time making this speech and did it because he did not want to say anything that would be antagonistic or that would create any further problems. The situation itself was a little unusual, and the prime factor in my opinion that this situation precipitated this myocardial infarction is the time relationship, the almost exact time relationship between the height of the stress and the onset of the attack."

The opinion of appellant's doctor that the events of November 15 did not cause the attack was based upon his stated belief that extreme or severe tension cannot cause or precipitate such an attack. He thus placed himself in that school of thought whose medical views have been rejected by our courts. See *Aromando, supra,* and the cases cited therein; *Weisenbach v. Borough of New Milford,* 134 *N. J. L.* 506, 509 (*Sup. Ct.* 1946).

We emphasize that causation is here the essential problem. The language of Judge Clapp in *Aromando, supra,* is therefore peculiarly pertinent to the facts of this case. He said (47 *N. J. Super.* at *page* 293):

574

"\* \* \* Prior to this heart attack petitioner had 'had no sickness' (as he put it) and no history of a previous cardiac ailment. Then, in the very midst of this unusual emotional incident, he sustains an occlusion. The sequence of events—the immediacy of the attack in relation to the episode of stress—bespeaks a causal connection."

We hold that there was a causal connection between the emotional events of November 15 and the attack. As we have concluded that there was an unusual strain (which would have entitled petitioner to the award even under the law as it was understood prior to *Ciuba*) there is no need in this opinion to consider the scope and extent of *Ciuba*. *Cf.,* 1 Larson, *Workmen's Compensation Law,* 38, "Injury From Usual Exertion Or Exposure."

Affirmed.

PRICE, S. J. A. D. (dissenting). I respectfully disagree with the majority opinion herein.

The divergent reasons advanced by the Deputy Director and the County Court for their respective determinations in favor of petitioner are outlined in the opinion of the majority.

The Deputy Director found that the petitioner was entitled to an award because he found that the petitioner had been subjected to "unusual strain" at the meeting on November 15, 1956, that the "meeting was charged with antagonism on the part of a few guests towards the petitioner, that this whole affair was a more unusual circumstance and duty than he was required to render on any other prior occasion during his employment with the respondent and at the same time he was placed under great emotional strain and stress. \* \* \* the petitioner at the time and place in question was subjected to unusual and abnormal excitement and nervous tension in a very warm room and that this constitutes an accident arising out of and in the course of his employment within the meaning of the Act. The facts in this case disclose an unusual event or happening sufficient to meet the requirements of the law."

On appeal the county judge found that the petitioner had been subjected to strain at the dinner on that day but that the strain was not unusual. He said:

"* * * I disagree with his conclusion that 'the meeting was charged with a certain antagonism on the part of a few guests toward the petitioner, that the whole affair was a more *unusual* circumstance and duty than he was required to render on any other prior occasion during his employment with the respondent * * *.' (Emphasis added.) In my opinion these conclusions were not warranted by the evidence.

I conclude that the evidence would warrant a finding that 'the petitioner felt or believed that three persons in the room were antagonistic and unfriendly to him, that the whole affair seemed to petitioner to be a more unusual circumstance and duty than he was required to render on any other prior occasion.' I see no reason why a man with petitioner's education and ability as a speaker should have any difficulty in addressing any local audience of any color on a topic or subject upon which he was prepared."

The county judge found, however, that petitioner was entitled to recover on the basis of the decision in *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N. J.* 127 (1958), which case had been decided subsequent to the disposition of the instant case by the division.

The majority opinion holds that, considering the totality of the testimony, petitioner had been subjected to unusual strain which would entitle him to an award "even under the law as it was understood prior to *Ciuba*" and consequently there is no need to consider the scope and extent of *Ciuba*. I am of the opinion that the proofs in the case at bar do not warrant recovery either on the theory of unusual strain or on the principle expressed in *Ciuba*.

I first direct my attention to the finding by the majority that on November 15, 1956 petitioner had been subjected to unusual strain and "was unusually tense, nervous and strained because of all of the circumstances combined."

My conclusions are undergirded by certain basic principles of law all of which the majority opinion recognizes and approves. For the purpose of emphasizing the importance of their application to the case at bar attention is initially

focused on them. They are: (1) To recover, petitioner has the burden of establishing that the heart attack he suffered on November 15 was an accident arising out of and in the course of his employment. This is largely a factual question which we must determine by an independent study of the entire record. *Ricciardi v. Marcalus Mfg. Co.,* 26 *N. J.* 445 (1958); *Russo v. United States Trucking Corp.,* 26 *N. J.* 430 (1958). (2) An injury suffered during the course of work does not *per se* entitle one to the benefits of the Workmen's Compensation Act. *Henderson v. Celanese Corp.,* 16 *N. J.* 208, 212 (1954). (3) "[T]he presumption subsists that injury from heart disease is the result of natural physiological causes, and the *onus* remains upon the petitioner to show by a preponderance of the probability that his employment was a contributing cause of the injury." *Yeomans v. Jersey City,* 27 *N. J.* 496, 509 (1958); *Ciuba, supra* (27 *N. J.* at *page* 138). (4) The strain or exertion may be emotional and nervous as well as physical. *Aromando v. Rubin Bros. Drug Sales Co.,* 47 *N. J. Super.* 286, 288 (*App. Div.* 1957), certification denied 26 *N. J.* 244 (1958). (5) As expressed in the majority opinion, in order to sustain the determination in favor of petitioner "it must be concluded that the events of November 15 produced an effect upon petitioner which precipitated the heart attack."

Applying these basic principles to the facts disclosed by the record before us and analyzing and weighing the evidence I find that the petitioner has not by a preponderance of the probabilities overcome the aforesaid presumption that heart disease is the result of natural, physiological causes.

It is recognized in cases of this kind that there is a wide variance in the type of events or occurrences which may be deemed to cause stress and strain of sufficient severity to justify a conclusion that a heart attack is thereby precipitated. It is important to note also that prior to *Ciuba* it was considered such strain had to be unusual to justify recovery. In two recent cases where emotional stress and strain had been the basis of awards it is noted that the

evidence had not only established their existence to a marked degree, but the circumstances creating such stress and strain were of a nature readily to be recognized from common experience and were in sharp contrast with the emotional stimulae to which petitioner himself, in the case at bar, asserts he was exposed.

In the case of *Fink v. City of Paterson*, 44 *N. J. Super.* 129 (*App. Div.* 1957), decided prior to *Ciuba*, it was agreed that Fink was in an advanced stage of arteriosclerotic heart disease prior to his fatal attack on November 26, 1954. He had sustained a heart attack in August 1953 and a cerebral embolism April 7, 1954. On November 26, 1954 he attended a business conference with his superiors at a large housing project in the management of which he had been employed for two and one-half years. Extreme dissatisfaction with his work had been expressed and he realized that his discharge might be the outgrowth of the conference. It was a tense meeting. Testimony at the hearing before the Deputy, we found, was such that the conclusions of the division and of the County Court that Fink died as a result of being subjected to unusual strain or anxiety were not "so plainly unjustified by the evidence" that the interests of justice would necessitate their nullification. Testimony from one of the men attending the conference was that Fink was "too nervous even to talk to me." Other employees were asked by one of the superiors to leave the conference because Fink was "so nervous" and was "progressively getting nervous," to the point that Fink's superiors suggested that Fink go back to his own office. Shortly thereafter Fink was found unconscious and died within an hour. Two medical experts, both specialists in internal medicine, gave it as their opinion that the emotional disturbance effected by the circumstances of the meeting was the aggravating and probable precipitating cause of the fatal heart attack.

On appeal appellant conceded that where a workman's heart failure is caused or precipitated by an unusual strain or exertion beyond the mere employment itself, sustained

while in the course of his employment, there is a compensable accident and the strain need not be physical or laborious in character but may consist of "unusual emotional or nervous strain and anxiety." We did not concur with the contention of the appellant that the testimony did not support a conclusion that the decedent was emotionally upset to any marked degree. We there said that the "decedent was being called to account. The situation confronting him at the meeting was fraught with the possibility of dire consequences if he were found derelict in his duties. The natural capacity of the occasion for evoking unusual strain and anxiety is obvious and the objective manifestations thereof apparent in the testimony summarized."

In *Aromando, supra,* also decided before *Ciuba,* it appeared that petitioner sustained a coronary infarction while at work. We recognized, as did the division and the County Court, that the evidence established that at the very time of the attack petitioner had been subjected, by the circumstances of his employment, "to unusual emotional stress." We stated (47 *N. J. Super.* at *page* 287) that "the principal question presented by these facts is whether the stress was a contributory cause of the infarction." Petitioner recovered in the division but the County Court reversed on the ground that causation had not been established. We reversed the judgment of the County Court and reinstated that of the division.

In the *Aromando* case it was accepted as a fact that petitioner had, prior to the attack, been suffering from "some coronary athero- or arteriosclerosis, of which he was unaware." Because of the unanimity of view that petitioner had been subjected at the very time of his attack to unusual emotional stress, its character and extent were not described in the opinion of this court. An examination of the original record however discloses that petitioner as display and advertising manager had been working under extreme pressure to meet a deadline for the completion of a certain job. The demands on him and the harassment were severe. The Deputy and

the court found that petitioner was forced to compress into 15 or 20 minutes work which ordinarily would have taken him two hours to perform. The Deputy determined that "there were ample psychological and physical pressures involved to cause the petitioner to develop a marked feeling of nervous stress, tension, excitement and frustration as he attempted to fulfill the demands made upon him by his employer." He had a heated discussion with his superior. He became angry and upset. It was an experience unique in the history of his employment. Suddenly he felt a pain in his chest despite which he "drove himself" to complete his work. The pain became worse and he had to be hospitalized.

The following statement by the Deputy in his determination in the *Aromando* case is most illuminating:

"It could therefore suffice to point out that petitioner, by establishing the occurrence of an unusual event which directly induced in him unusual feelings of stress, tension, emotion, excitement and frustration, with the onset of a severe heart attack coming on while he was in the very throes of this unusual emotional upset, has established the validity of his case beyond a mere preponderance of the evidence and by a sequence of events of cause and effect which in and of themselves bespeak causal relationship of the injury to the employment."

In the case at bar the majority opinion notes that the Deputy, as stated, found that petitioner "had been speaking at the meeting in an atmosphere charged with antagonism; that at the time and place petitioner was 'subjected to unusual and abnormal excitement and nervous tension in a very warm room.'" My initial departure from the majority opinion is in its finding that the facts justified the conclusion that petitioner on November 15 was subjected to unusual strain which finding, as above stated, brings the majority to the conclusion that because thereof (as it also found that the attack was causally related to the unusual strain) there is no need to consider the scope and extent of *Ciuba* in disposing of the instant case.

I have examined the facts disclosed by the record to determine whether petitioner has in my opinion by a preponderance of the evidence sustained the burden of proof of an accident arising out of and in the course of his employment. The essential facts are not in dispute. The factual details of the onset of the attack are outlined in the majority opinion.

One of the controlling considerations in a case of this type requires us to determine, as far as the evidence reveals, the nature of the background and experience of petitioner, the stature he had attained in his chosen profession and his temperament and physical characteristics. I find that the evidence amply justifies the conclusion which I reach that he was a calm, deliberate person, conscientious and sincere in the performance of his work, not only seasoned in his chosen profession but with a vast experience over a period of 13 years centered in the community in which he was the superintendent of schools and in which he lived. Not only was he thoroughly familiar with the particular problems of the community as they concerned the administration of the school system but he had been actively engaged in the community interest in dealing with the particular problem of integration. His testimony at the hearing before the deputy not only graphically expressed his desire to improve his knowledge in this particular field but emphasized the span of years over which he had been so engaged. He said: "Well, I had to read a great deal, a great number of books on the problem. I felt that I had lived with it for ten years, and I felt that in my position answers were being required of me and they had to be given and I had to have some objective background for them."

Petitioner was an active participant in civic work and of necessity both within and outside his position as superintendent was accustomed to meeting and dealing with persons of various types. He was used to public speaking and spoke once or twice a month at meetings of various organizations and had evening engagements "on the average of three nights a week." His work was largely administrative. His super-

vision encompassed 200 persons including teachers and other employees in the school system. He worked very closely with the board of education whose meetings he attended and whose policies and program he strove to follow and enforce. During this entire period he had been in good health and as found by the majority had not manifested any cardiac or circulatory illness.

The record reveals that when petitioner was interrogated on direct examination before the Deputy with reference to the subject of integration in the Woodbury schools the following testimony was given:

"Q. Now, what would you say was your general feeling as this situation became more acute, how did you feel about the subject matter let's say at or about September 1, 1956 when these re-districting activities took place?
\* \* \* \* \* \* \* \*
Q. Let's delete from my question the fact that the redistricting took place in September and just ask an answer to that question in respect to that time early in the fall of 1956, how did you feel about this situation?
A. Well, I might say that I was—I felt quite tense over the situation. I had been through a year of intense pressure from three groups and I seemed to be in the middle of the entire picture. It was largely my responsibility to try to reach a middle ground, try to obtain certain things which would satisfy both sides \* \* \*."

Prior to the P. T. A. sponsored dinner held on November 15 petitioner had been asked by one of the teachers to speak at the affair. She asked him to speak on the subject of how "the new school could be more of an integral part of the City of Woodbury" or as he later expressed it under cross-examination "how this school could help in the integration problem in Woodbury." He declined to speak on that subject and expressed his view that some one outside of the school system might do better. He was later told that he might choose his own subject which he did. The exact topic he selected is not revealed by the evidence but petitioner testified that he dealt with race relationships— "how we can get together and work together and live together." He said he spent a substantial time in the prepara-

tion of his speech as he wanted to "say certain things, to reflect my philosophy and my feelings on this whole racial question * * *."

His testimony is that during the early part of the evening prior to being seated at the head table at the dinner he had no feeling of tenseness or emotional upset. He testified that he may have told the appellant's examining doctor that he had been tense and overactive for years. The record reveals the following testimony by him in that regard:

"Q. Let's leave it up to you, doctor, in your own feeling for a period of years or period of time, I'd like you to establish the time prior to your onset, were you tense, overactive or very active?

A. Well, I will say I was very active.

Q. Well, is it true that you were a little bit tense over this period by reason of this particular integration problem. I don't mean all the time, but occasionally you became tense?

A. Oh, probably so, I probably had moments of tensity as anyone else does, but I feel November 15th was the culmination of all of it.

Q. By reason of the fact that you had had a heart attack?

A. No, I was in a situation that I had never been in before."

We next examine the record to determine the petitioner's own concept of the occasion of the banquet on November 15 and his reaction to the events of that evening. He stated that he believed that those attending had "a very fine time, they enjoyed it very much" and "many, many, many very close friends of mine attended the meeting and for whom I have the greatest respect, but these other factors were the factors of disturbance personally"; that there were two men present of whose presence he was particularly aware. His testimony on this subject was as follows:

"Q. What are you able to say about your reaction if any to their presence, both at that time and at the time you commenced your speech?

A. This is entirely personal and entirely subjective but after being a teacher in a classroom for many years and facing children, there are always children sometimes in your classroom who are not interested in what you are saying. In fact, they are very antagonistic to what you are saying or what you are doing, at least their faces reflect that sort of feeling."

He added: "Perhaps I had them all wrong, but it was my personal opinion that they were sitting there with an expression on their face like 'well, what are you going to say now' or 'what can you say that you haven't already said.' I felt that. They were in front of me from the very time that they arrived at the dinner."

The questioning continued:

"Q. And more particularly, what was your feeling at the time you commenced to speak, if any, in respect to those men?

A. Well of course the speaker can look in various corners of the room, but gradually you must survey certain parts of the audience, and I was cognizant that these men were still of the same type of expression on their face. This they had all evening. As I say, that may be just a personal reaction, but they had been unfriendly and had been very militant in their attitude toward me."

On cross-examination he testified that the last time he had spoken with the two men was in the late spring of 1956.

He testified that as he spoke at the banquet "everyone was attentive" and said "with the exception of the individuals mentioned, it seemed to be that they were sitting listening to what I was saying." He added that, with the exception of the two men he mentioned he had the general impression that his speech was being well received. He testified that the two men did not "grimace" but that he had experienced "unpleasant association" with them in the past. He testified that he had no fear for his personal safety during those past associations which occurred during 1955–1956. Referring further to that prior period of time, he said: "My only hope was that I could maintain my dignity to keep from physically expressing myself to them." He added that prior conservations between them and him had been "heated on their part" but that he gave himself "credit * * * for being as calm as I could be."

He also testified that the toastmistress at the banquet had in his opinion been unfriendly to him in the past and, had he known she was to be toastmistress, he would have declined the invitation to speak. He was asked whether his feeling

that she was unfriendly "had excited some emotional tenseness or strain within you." He answered: "That is my opinion." He added that: "I don't think that she would feel that I was very friendly to her * * *. I feel that she is an antagonistic individual toward me no matter what I might say." When pressed as to the basis of the presumed ill-feeling he referred to an article appearing three years prior to November 1956 in a Philadelphia newspaper in which a parental group from Woodbury had expressed dissatisfaction with certain school facilities and the toastmistress was among the group. He then gave the following further testimony:

"Q. But you have no clear recollection of any unpleasant experiences?
A. No, where she and I personally engaged in an argument or exchange of words."

He was asked on cross-examination whether he had any conversation with the toastmistress at the dinner and the following testimony was elicited:

"Q. But did you have any conversation with her at all?
A. Oh, probably 'It is a nice affair'; or 'It is a good crowd' or 'Very nice of these men to serve the meal.' Something like that probably.
Q. Did she give you any answers aside from your own internal feeling that would give anybody else that could overhear the conversation that she might be unfriendly to you?
A. I can appreciate as toastmistress she had other things to think about, but as far as I can remember she did nothing to extend the conversation or to attempt to make it a very friendly one. 'We are glad you are here and we hope you like it' all that sort of thing. Now, I have gone through it before and you have too where you have been a chairman of a meeting and you have had a guest speaker and you have gone all out to try to make that guest speaker feel at home. You have talked to him during the meal. Now, I didn't have that experience there at all."

He further testified that he never had any unpleasant encounter with the toastmistress. In passing I note that she testified at the hearing in the division that until November 15,

1956 she had never even spoken with petitioner; that she had "a friendly feeling toward him" and knew of no basis for antagonism. She testified that she exchanged a few remarks with him during the dinner and introduced him.

Other witnesses testified that petitioner's speech was well received, that there were parts of it which were light and humorous. It was described as an enjoyable social gathering. One of petitioner's witnesses, the Director of Vocal Music in the Woodbury Schools attended the banquet. She described it as "a very pleasant and friendly association." She had accompanied the petitioner on a survey of the building immediately preceding the banquet. She testified that she observed nothing unusual about petitioner before he made his speech; that "he had a very nice sense of humor"; that the speech was "particularly interesting." She said, however, that she noticed that the speech "dragged," that "it didn't go smoothly like I usually hear him speak. He usually speaks with command. It just didn't go that way."

One of the witnesses for petitioner was a school teacher who was in attendance at the banquet. She said it was a friendly affair. She testified that petitioner made "a very excellent speech"; that it was well received by those present and petitioner was applauded, but that it seemed to her that "he was terribly nervous and pale"; that he had not seemed nervous or upset while the preliminary tour of the building was in progress.

As noted in the majority opinion reference was made by the Deputy to the fact that the room was "very warm." An examination of the record shows that petitioner testified he felt warm and that the room was warm. The teacher and the director of music both testified that the room was warm. However the janitor testified that the heating system which had thermostatic control was working satisfactorily on November 15 and that the temperature of the room which he checked after the banquet was 72°.

The petitioner's family physician testified that his diagnosis of petitioner's condition was "arteriosclerotic heart disease with an acute myocardial infarction." He based his opinion of the causal connection between the events at the banquet and petitioner's attack on the factual assumption of the "intense emotional situation present." He had been told by petitioner as part of the history given to him that the room was "stuffy" and "hot"; that he was under nervous tension at the time that he was making the talk; that he was making a talk "under conditions that were rather trying to him." In response to a long hypothetical question he expressed the belief "that the circumstances were such that that was the precipitating factor or the causation" of the attack.

A doctor specializing in internal medicine expressed a similar opinion in response to a hypothetical question. His viewpoint is outlined in part in the portion of his testimony quoted in the majority opinion. It was as follows:

"Q. Now, how would you explain that precipitation by specific reference to the chain of events as described?

A. Well, number one; this was not the usual situation in which Dr. McClain ordinarily found himself, it would have to be placed in a category of a different or unusual situation as evidenced from the history primarily that being an educator, a person in that status usually can make a speech with very little preparation. He spent a lot of time making this speech and did it because he did not want to say anything that would be antagonistic or that would create any further problems. The situation itself was a little unusual, and the prime factor in my opinion that this situation precipitated this myocardial infarction is the time relationship, the almost exact time relationship between the height of the stress and the onset of the attack."

On cross-examination he said:

"Q. Now keeping in mind, Doctor, is it true or not that in these cardiovascular cases the onset in many cases is a natural degenerative process?

A. The onset is unpredicted and unwarranted."

He stated that the alleged warmth of the room might be considered an added but not a precipitating factor.

On an independent examination of the evidence, giving due regard to the opportunity of the Deputy to observe the witnesses I reach the conclusion that the events of November 15, which the petitioner himself relates, cannot justifiably be considered as the basis for the tension asserted. I contrast this case with the facts in the *Fink* and *Aromando* cases. We have here no such pressure. At most petitioner thought that two men in the audience were looking at him disdainfully and he believed the toastmistress was "unfriendly." To conclude that such impressions can be the foundation of "an accident" within the meaning of the Workmen's Compensation Act is, in my opinion, to discard the aforesaid presumption expressed in *Snoden v. Watchung Borough*, 29 *N. J. Super.* 41, 45 (*App. Div.* 1953) and in *Ciuba, supra,* 27 *N. J.* at *page* 138.

Petitioner's doctors, as stated, stress the immediacy of the attack in relation to the episode of stress. But the lack of justification for this award is found in the elements which petitioner and the internist list as creating the stress.

The controlling decisions direct us to recognize that presumptively "heart failure results from natural physiological causes" and to require the claimant to overcome the presumption by proof by a preponderance of the probabilities that the employment was a contributing cause of the injury or death. I find that neither on the basis of unusual strain expressed in the majority opinion nor on the basis of the less stringent requirement expressed in *Ciuba, supra,* is petitioner entitled to prevail. I vote to reverse the judgment of the county court.

*Mr. William G. Freeman* argued the cause for the appellant.

*Mr. H. Hurlburt Tomlin* argued the cause for the respondent.

PER CURIAM. The judgment is affirmed for the reasons expressed in the majority opinion of Judge (now Justice) Schettino in the court below.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR and HALL—6.

*For reversal*—None.